UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

C.L.

     Plaintiff,

v.

THE LODGE IN NORCROSS, LLC,
SID PATIDAR, and
JOHN DOES 1-5,

     Defendants.

CIVIL ACTION FILE

NO.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff files her Complaint and shows the Court as follows:

## Introduction

1.

When C.L. was 16 years old she was a victim of child sex trafficking at the Red Roof Inn located at 5171 Brook Hollow Pkwy, Norcross, GA 30071. On January 6, 7, and 8th 2014, C.L. was sold for sex by a trafficker to multiple buyers at the Red Roof Inn. Defendants owned and/or operated the Red Roof Inn at such time. As set forth herein, Defendants are liable to Plaintiff for damages arising from the crimes and harms committed against her. Given the nature of the case, Plaintiff is identified in this Complaint by her initials. Plaintiff's counsel will disclose her full

1

name to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

2.

Defendant The Lodge in Norcross, LLC (hereinafter referred to as the "LLC", the "Defendant" or the "Hotel") is a Georgia limited liability company. The LLC was administratively dissolved by the Georgia Secretary of State on December 7, 2016. However, pursuant to O.C.G.A. § 14-11-603(b)(3) "[a] limited liability company administratively dissolved continues its existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs." Additionally, pursuant to O.C.G.A. § 14-11-603(b)(3) "[t]he administrative dissolution of a limited liability company does not terminate the authority of its registered agent."  The registered agent for the LLC is Sid Patidar, who may be served at 3200 Windy Hill Rd SE Suite 1600W Atlanta, GA 30339.

3.

Pursuant to O.C.G.A. § 14-11-605, to the extent a dissolved limited liability company does not discharge, make provision to discharge, or dispose of a claim against it, such claim may be enforced against the limited liability company, to the

---

[1] Plaintiff will be filing a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include the sex trafficking of C.L.  Plaintiff's anonymity will provide for her own personal safety and will protect Plaintiff from the public disclosure of details which are intimate and personal in nature.

extent of its undistributed assets, or against each member receiving a distribution in winding up, to the extent of the assets so distributed to such member. Here, Plaintiff believes and contends that Sid Patidar is a member of the LLC, and the identity of any other members of the LLC, if any, are currently unknown to Plaintiff, so Plaintiff has used pseudonyms John Does 1-5 as placeholders for the other individual members of the LLC, and once Plaintiff learns the true identities of such members, Plaintiff will amend this Complaint to substitute the true identities of such members in place of the pseudonyms John Does 1-5.

4.

At all times relevant herein, Defendants owned, operated, maintained, controlled, managed, and/or were responsible for securing the Hotel, from which Defendants benefited financially.

5.

Defendants knew or should have known of both C.L.'s sex trafficking in particular and the rampant sex trafficking and prostitution at the Hotel for years, before, during, and after Plaintiff's trafficking. Defendant knew or should have known, among other reasons, because:

    a.    C.L. and other young girls who were being sex trafficked were forced to stand outside and walk around the outdoor part of Red Roof Inn property and solicit sex from male strangers. C.L. and

other trafficking victims wore revealing and inappropriate clothing and they would be approached by male strangers who were driving onto the property;

b.      Sex buyers would frequently drive into the Hotel's parking lot to look at all the different young girls being sold for sex. The buyers would then select the girl they wanted to purchase and the buyers would then hand over money to the victims and/or their traffickers and proceed to enter Hotel rooms for short periods of time to have sex with the victims.  After having sex with the victims, the buyers would get in their cars and leave;

c.      The above pattern of activity occurred repeatedly in open sight at the Hotel each day, throughout the day;

d.      The Hotel was located within the Gwinnett Village Community Improvement District ("CID") and the director of the CID had, prior to C.L.'s trafficking in 2014, gone to the Hotel on multiple occasions to speak to the Hotel employees about the continuing problems with commercial sex at the Hotel.

e.      The director of the CID observed that the Hotel "appeared to involve a sophisticated network that protected the commercial sex trade, meaning there were people other than the girls being sold for sex

4

involved in keeping the commercial sex operations at the hotel running in a way that avoided the police."

f.   While she was trafficked at the Red Roof Inn, C.L. was sold to multiple different men and the Red Roof employees observed C.L. and either knew or should have known she was a victim of sex trafficking;

g.   While she was trafficked at the Red Roof Inn, Hotel housekeeping employees visited C.L.'s room. The trafficker would not let the housekeepers into the room, but he opened the door and C.L. handed them the used towels from the room and the trash from the room containing used condoms and condom wrappers, and C.L. received new towels from the housekeepers;

h.   The Hotel's staff saw C.L. and knew or should have known she was obviously being sold for sex, yet they did nothing to intervene. Instead, the Hotel staff continued to participate in the sophisticated network to protect the commercial sex trade, including continuing the long-running practice of continuing to give warnings to those who engaged in the sex trade when the police were coming to the property;

i.   According to the Gwinnet Village Community Improvement

5

District director, "the Red Roof Inn was ground zero for illegal commercial sex in Norcross."

6.

Despite all of the above knowledge, Defendants negligently and recklessly failed to take appropriate and reasonable measures to prevent sex trafficking from occurring at the Hotel, including Plaintiff's sex trafficking in particular, and instead actively took steps to allow the trafficking to continue.

7.

At all times relevant to this Complaint, C.L. was a minor child victim of sex trafficking at Defendants' Hotel.

8.

Sex trafficking and prostitution were common occurrences at the Hotel and Defendant chose to ignore, allow, condone, facilitate, support, or permit such activity at the Hotel. Defendants are liable to Plaintiff for the Hotel's employees and agents' actions and failures to act. Defendants' liability to Plaintiff is straightforward:

a. The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a

venture which that person ***knew or should have known*** has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a). Defendant Hotel knowingly benefited from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA. While operating the Hotel, a common undertaking involving risk and potential profit, Defendant (i) rented a room to Plaintiff's trafficker so Plaintiff could be sold for sex at the Hotel, and (ii) did so despite what Defendant knew or should have known about Plaintiff being a victim of sex trafficking at the Hotel. As a result of Defendant and/or his employees or agents' conduct, Plaintiff suffered physical and mental harms, and Defendants are liable to Plaintiff for the damages arising from those harms under the TVPRA. Additionally, because Plaintiff was a child when she was trafficked at the Hotel, Masha's Law, 18 U.S.C. § 2255, provides an avenue to pursue a civil remedy for the substantive violation of 18 U.S.C. § 1591, with the same substantive analysis under the § 1595 claim above; and

b. The Hotel constituted a public nuisance under Georgia law because the Hotel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, sex trafficking, crimes against women, drugs, violence, and other dangerous illegal activity. As a

direct result of this nuisance, Plaintiff was sold for sex at the Hotel, causing her special damages.

9.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendants, the allegation is that Defendants engaged in the act, deed, or conduct personally or through one or more of their officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Hotel.

10.

Further, a person under the age of 18 cannot consent to having sex in exchange for money under any circumstance. Any sale of sex in exchange for money involving a person under eighteen (i.e., "minor sex trafficking") is *criminal* sex trafficking under federal law. 18 U.S.C. § 1591(a). Minor sex trafficking does not require evidence that the victim was subject to "force, fraud, or coercion." 18 U.S.C. § 1591(a)(1), *et seq.* Every person who engages in commercial sex with a minor is trafficking that minor under 18 U.S.C. § 1591(a)(1). Still, Plaintiff C.L. was sold for sex at the Hotel, and despite such crimes obviously occurring, Defendant failed to intervene in any way to report or stop such crimes.

11.

Plaintiff brings this suit against Defendants to recover for the physical, emotional, and mental harm caused by her sexual exploitation at the Hotel, which was permitted to occur as a direct and proximate result of Defendants' negligent, reckless, and willful failures to prevent prostitution, crime, violence, and sex trafficking from occurring at the Hotel.

**Parties, Jurisdiction, and Venue**

12.

C.L. was a 16-year minor at the time of her sex trafficking alleged herein.

13.

At the time of C.L.'s trafficking, Defendants owned, managed, supervised, operated, oversaw, controlled the operation of, and rented rooms at the Hotel, from which Defendants benefited financially.

14.

Defendant Patidar is a resident of the State of Georgia. Service can be made upon Patir at 3200 Windy Hill Rd SE Suite 1600W Atlanta, GA 30339. Defendant Patidar is also the registered agent for the Hotel, and the Hotel can be served through Defendant Patidar at the same address.

15.

Jurisdiction and venue are proper as to Defendants, and Defendants were properly served with process in this action.

### Plaintiff C.L.'s Sex Trafficking at the Hotel

16.

While she was 16 years old, C.L. was sex trafficked at the Hotel for on or around January 6, 7, and 8th 2014.

17.

C.L.'s sex trafficker sold C.L. to numerous men at the Hotel.

18.

While at the Hotel, C.L.'s sex trafficking occurred openly and obviously and was observed by the Hotel employees, who also participated with the trafficker in allowing the trafficking to continue.

19.

C.L. was required to meet buyers outside on the Hotel property and then accompany them into the Hotel room where they would buy her for sex.

20.

During the time C.L. was being trafficked for sex, Hotel employees lived at the Hotel themselves or, at minimum, staffed the Hotel 24 hours per day / 7 days per

week, and thus, Defendant and/or the other Hotel employees could see the sex-trafficking activity that was occurring openly and publicly on the property.

21.

Hotel employees frequently saw Plaintiff C.L., her trafficker, and the other sex traffickers and sex trafficking victims at the Hotel.

22.

Defendant and/or the other Hotel employees had friendly, close personal relationships with traffickers at the Hotel, including Plaintiff C.L.'s trafficker, and thus would participate and allow the trafficking to continue without interruption.

23.

While Plaintiff C.L. was trafficked for sex at the Hotel, she exhibited numerous well-known and visible signs of a sex trafficking victim, of which Defendant and the other Hotel employees knew or should have known. These included Plaintiff's young age, Plaintiff being required to openly stand in front of the Hotel to be approached by adult male strangers who would then accompany Plaintiff into her Hotel room for short periods of time, and Plaintiff's monitoring and control by her trafficker.

24.

Plaintiff's sex trafficker operated openly and brazenly at the Hotel, as did other sex traffickers. In addition to Plaintiff C.L.'s trafficking, there were numerous

other sex trafficking victims at the Hotel at any given time and numerous other traffickers controlling those girls at the Hotel.

25.

Due to the high number of victims being sold for sex at the Hotel, a large number of buyers frequented the Hotel each day. Defendant knew or should have known that this was an indication of sex trafficking, and minor sex trafficking, at the Hotel.

26.

Defendant knew or should have known that the Hotel served as an open market for sex, including with victim C.L., based on all of the obvious activity that would occur in the open and public areas on Defendant's Hotel property.

27.

C.L. was ultimately rescued in an undercover police sting operation on January 9, 2014, right after her trafficker had moved her from the Red Roof to a nearby Super 8 motel in an attempt to continue selling her for sex there.

**Defendant's Knowledge of Prior Crime and Sex Trafficking at the Hotel**

28.

For many years prior to Plaintiff's trafficking, the Hotel was rampant with other instances of sex trafficking, prostitution, crimes against women, dangerous illegal activity, drugs, and violence.

29.

Before and during Plaintiff's sex trafficking at the Hotel, Defendants and other Hotel employees knew or should have known about the crime, including specifically the sex trafficking occurring at the Hotel.

30.

Prior to Plaintiff's sex trafficking at the Hotel, Defendant and other Hotel employees knew or should have known that rooms at the Hotel were frequently used for short interactions of commercial sex with guests being trafficked at the Hotel.

31.

Prior to and during Plaintiff's trafficking at the Hotel, the premises and its approaches were known for crime, prostitution, and sex trafficking, which is why Plaintiff's sex trafficker kept Plaintiff at the Hotel to be sold for sex there. In short, Defendant provided a busy market for just that type of illegal activity.

32.

Prior and in close proximity to Plaintiff's trafficking at the Hotel, multiple witnesses observed obvious sex trafficking, prostitution, and other crimes occurring at the property:

**Witness Number 1**

33.

A witness named Chuck Warbington who is familiar with the Hotel has previously provided a witness declaration attached hereto as Exhibit 1.

34.

From 2006 – 2016, Mr. Warbington was the executive director of the Gwinnett Village Community Improvement District ("CID"), which was the largest CID in the state at the time.

35.

The Gwinnett Village CID encompassed much of Norcross, including the Indian Trail/Brook Hollow intersection and the Red Roof Inn located at 5171 Brook Hollow Parkway, Norcross, Georgia 30071.

36.

According to Mr. Warbington, the commercial sex trade at the Red Roof Inn was "rampant" while he was the director of the Gwinnett Village CID. In years prior to Plaintiff's trafficking in January 2014, Mr. Warbington often saw 3-4 young girls outside at the Red Roof Inn who were soliciting for sex at the Red Roof Inn. According to Mr. Warbington, this activity was obvious and was apparent to any employee of the hotel who looked outside of the front office.

37.

As the director of the CID, Mr. Warbington intentionally drove through the parking lot of the Red Roof Inn at least once a month during his tenure to see what was going on at the hotel and to attempt to speak to the manager and employees of the property about the continuing problems with commercial sex at the hotel. When Mr. Warbington spoke to them, the managers at the hotel would only nod their heads. They gave no response and never stated that the hotel would do anything about the rampant commercial sex at the hotel.

38.

On multiple different occasions prior to Plaintiff's trafficking in 2014, when the executive director of the CID drove through the Red Roof Inn, he was personally solicited for sex by young girls who would approach his car.

39.

Based on Mr. Warbington's observation and experience working with the Gwinnett County District Attorney's Office and Norcross Police Department, the hotel appeared to involve a sophisticated network that protected the commercial sex trade, meaning there were people other than the girls being sold for sex involved in keeping the commercial sex operations at the hotel running in a way that avoided the police. According to Mr. Warbington, it appeared that someone at the hotel was giving warnings to those engaged in the sex trade when the police were coming to

the property.  When Mr. Warbington drove through the hotel, I observed people who appeared to be watching or were looking out for the police at the Red Roof Inn. Often, when the police went to the hotel, even if undercover, the prostitution or trafficking activity would quickly dissipate for a time before returning once the police were gone.

40.

However, instead of working with the Police Department and the District Attorney's office the hotel appeared to be working against them and helping the commercial sex trade to flourish at the Red Roof Inn hotel.

41.

According to Mr. Warbington, the Red Roof Inn was "ground zero" for illegal commercial sex in Norcross while he was the director of the Gwinnett Village CID.

42.

Mr. Warbington worked closely with the Gwinnett County District Attorney's Office and the Norcross Police Department to discuss and attempt to remediate the commercial sex trade at the Red Roof Inn, but the hotel's reputation for allowing these criminal activities was well known by Mr. Warbington and the government officials he worked with regularly.

43.

Mr. Warbington even directly informed the corporate ownership of the Red Roof Inn of the horrific problem of the commercial sex trade at the Red Roof. Mr. Warbington personally called the Red Roof Inn corporate multiple times, but no one from the Red Roof Inn corporate team would return his calls. Mr. Warbington also sent multiple letters to the Red Roof Inn corporate team describing the problem of commercial sex on their property and asking them to provide a solution to help stop the sex trade, but Red Roof Inn never responded to these letters.

44.

According to Mr. Warbington, it was clear that the Red Roof Inn allowed a busy commercial sext trade to occur at the hotel for years (including leading up to Plaintiff's trafficking) and the Red Roof never took any steps to prevent or prohibit these sex crimes. In fact, it appeared that the Red Roof wanted to keep that activity going because it was profiting from renting rooms to the criminals.

**Witness Number 2**

45.

A witness named Jon Doherty. who is familiar with the Hotel has previously provided a witness declaration attached hereto as Exhibit 2.

17

46.

Mr. Doherty is a police officer with Gwinnett County and from 2005 to 2020, Mr. Doherty worked for the Special Investigations Vice unit in Gwinnett County.

47.

As a police officer, Mr. Doherty frequently investigated commercial sex at the Red Roof Inn located at 5171 Brook Hollow Parkway, Norcross, Georgia 30071. It was one of the hot spots he investigated for commercial sex and other criminal activity.

48.

Prior to Plaintiff's trafficking, the Red Roof Inn was a location that was well known for illegal commercial sex. The activity was constant. The commercial sex activity at the Red Roof was obvious and would have been seen by the employees who worked at the hotel. The hotel's reputation for allowing these criminal activities was well known by Mr. Doherty and other members of the Gwinnett County and Norcross police departments who investigated that area.

49.

According to Mr. Doherty, the Red Roof did not try to get rid of the commercial sex at the property prior to Plaintiff's trafficking. The Red Roof did not work with the police to report crime and commercial sex to the police. The Red Roof turned a "blind eye" to the commercial sex at the property.

50.

Mr. Doherty often worked undercover at the Red Roof and he personal saw girls who were leaning over the balcony of the hotel soliciting sex, walking the street in front of the hotel soliciting sex, and soliciting sex at the gas station nearby and taking buyers back to the Red Roof Inn.

51.

In Mr. Doherty's experience as a police officer, 90% or more of the "prostitutes" or those involved in commercial sex were actually sex trafficking victims who were either minors, or coerced or controlled by a trafficker.  And, allowing prostitution on a property is the greatest risk factor for having sex trafficking occur on the property.

**Defendants' Negligent Failure to Act**

52.

Defendants and the other Hotel employees knew or should have known that obvious sex trafficking, including Plaintiff's sex trafficking, was occurring every day at the Hotel.

53.

Despite this knowledge, Defendants negligently and recklessly allowed the crimes perpetrated against Plaintiff and other sex trafficking victims to continue.

19

54.

Despite the dangerous, illegal, and criminal activity at the Hotel, Defendants negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

55.

Despite having actual or constructive knowledge of this illegal activity, Defendants negligently failed to take reasonable and necessary steps to stop such illegal and dangerous activities from occurring.

56.

Additionally, Defendants negligently failed to provide proper training to their employees, including among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the Hotel.

57.

Defendants also negligently failed to provide proper training to their employees on what they were supposed to do if they saw or suspected that dangerous or illegal activity, prostitution, or sex trafficking was occurring at the Hotel.

58.

Defendants also negligently failed to train its staff in a reasonable and uniform manner, including, among other things, on how the staff were supposed to interact

20

with the police and attempt to determine the nature and cause of crime occurring at the property, so that the Hotel could better deter or prevent crime in the future.

59.

Defendants also negligently failed to develop a reasonable security plan to deter and prevent dangerous, violent, and illegal activity from continuing to occur at the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

60.

Defendants knew or should have known that they were permitting the Hotel to be used as a place of prostitution and sex trafficking.

**Defendants' Knowledge of Sex Trafficking Generally**

61.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' adoption of the Palermo Protocol, to prevent, suppress, and punish trafficking in persons.

62.

Defendants knew or should have known that during the relevant period Atlanta was a hub of sex trafficking and that the crime was prevalent in the city, including at the Hotel. According to a well-publicized study commissioned by the

21

U.S. Department of Justice, Atlanta had one of, if not the, largest illegal sex trafficking economies in the country.[2]  In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000. Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendant has received and retained some of those illicit profits through renting Hotel rooms used for the trafficking of Plaintiff and other victims.

63.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[3] and as "the number one city for child sex trafficking."[4]

---

[2] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited May 21, 2026); *see also* Meredith Dank, et.al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12, 2014), 30-32, *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited May 21, 2026).

[3] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month, (Jan. 29, 2015), *available at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited May 21, 2026).

[4] *Id.*

64.

Defendants knew or should have known that the Hotel and the surrounding the Hotel was known to be common and notorious locations for prostitution, sex crimes, and sex trafficking to occur.  That is why Plaintiff's traffickers sold her there.

65.

Defendants knew or should have known that Hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking.  Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" City *of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

66.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that ninety-two percent of the calls it received involving Hotels and Hotels reported sex trafficking, and another two percent reported a combination of sex and labor trafficking.[5] And the Polaris Project found that "75% of [trafficking] survivors responding to Polaris's survey reported coming

---

[5] *Human Trafficking and Hotels & Hotels*, Polaris Project, https://polarisproject.org/human-trafficking-and-hotels-Hotels/ (last visited May 21, 2026).

into contact with Hotels at some point during their exploitation . . . . Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from Hotel staff."

67.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[6]

68.

Defendants knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps Hotels can take:

    a. establish corporate policy and procedures against sexual exploitation of children;

    b. train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

    c. include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

    d. provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

---

[6] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited May 21, 2026).

e.  support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

f.  report annually on the company's implementation of Code-related activities.

69.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given Hotels the tools to address the scourge of sex trafficking at Hotels.

70.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help Hotels detect and respond to human trafficking.  DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other Hotel personnel, to be vigilant in looking for signs of human trafficking at Hotels and Hotels, such as:

a.  persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

b.  persons who lack freedom of movement or are constantly monitored;

c.  persons who have no control over or possession of money or ID;

d.  persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

25

e.  requests for room or housekeeping services (additional towels, new linens, etc.), but denial of Hotel staff entry into the room;

f.  the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.  extended stay with few or no personal possessions in the room;

h.  excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.  the same person reserves multiple rooms;

j.  a room is rented hourly, less than a day, or for an atypical extended stay;

k.  attempts to sell items to or beg from patrons or staff;

l.  cars in the parking lot regularly parked backward, so the license plates are not visible;

m.  loitering and solicitation of male patrons;

n.  waiting at a table or bar and picked up by a male (trafficker or customer);

o.  persons asking staff or patrons for food or money; and

p.  persons taking cash or receipts left on tables.

## 71.

Without a market, a place for the buying and selling of humans for sex, sex trafficking would cease to exist. Defendants, for a fee, provided that market, a private and anonymous market for Plaintiff to be sold for sex at its Hotel.

26

## COUNT I:

## STATUTORY LIABILITY: SEX TRAFFICKING 18 U.S.C. §§ 1591, 1595 and MASHA'S LAW, 18 U.S.C. § 2255

72.

Plaintiff incorporates the paragraphs above as if fully restated herein.

73.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

74.

Defendants knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated by the operation of the Hotel, including the revenue generated for the room in which Plaintiff was trafficked. Each day Plaintiff was trafficked at the Hotel, Defendant knowingly benefitted by receiving money from Plaintiff's trafficking in the form of room-rental fees.

75.

Defendants participated in a Hotel venture and knew or should have known that his operation of the Hotel violated the TVPRA by harboring and falsely imprisoning Plaintiff so that she could be sold for sex at the Hotel Defendants also participated in a venture by actively cooperating with, accepting bribes from, serving

as a lookout for, and allowing Plaintiff's sex trafficker to harbor, falsely imprison, and traffic Plaintiff at the Hotel.

76.

As part of her sex trafficking, Plaintiff was falsely imprisoned at the Hotel. Defendants also participated in a venture by actively cooperating with, accepting bribes from, serving as a lookout for, and allowing Plaintiff's sex trafficking to harbor, falsely imprison, and traffic Plaintiff at Defendants' Hotel.

77.

The venture in which Defendants participated was in or affecting interstate commerce.

78.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives participated in Plaintiff's child sex trafficking at the Hotel. Defendants knew or should have known of this participation.

79.

Defendants also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Hotel.

28

80.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of his agents and representatives.

81.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in this venture.

82.

Defendants are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

83.

Defendants are liable for damages arising from the indivisible injuries they caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

84.

Plaintiff was under the age of 18 when she was trafficked at the Hotel.

85.

Plaintiff was a victim of violations of 18 U.S.C. § 1591 at the Hotel.

29

86.

As described herein, Defendants knowingly benefitting from participating in a venture that he knew or should have known engaged in an act of sex trafficking at the Hotel, including the harboring and other trafficking activities which harmed Plaintiff.

87.

Plaintiff suffered injuries as a result of Defendant's violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255, and Defendants face liability under such statutes.

88.

Thus, as described herein, Defendants are jointly and severally liable to Plaintiff for compensatory and punitive damages, in an amount to be determined at trial.

## COUNT II
## NUISANCE

89.

Plaintiff incorporates the paragraphs above as if fully restated herein.

90.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of

shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

91.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

92.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

93.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

## Public Nuisance

94.

The Hotel's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

95.

The Hotel caused or contributed to a blighting effect on the surrounding community, so that the Hotel negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Hotel, although the effects on each person may have varied.

96.

The illegal prostitution and sex trafficking nuisance occurring at the Hotel had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

97.

The acts and omissions of Defendants in permitting prostitution and sex trafficking at the Hotel caused special damages to Plaintiff, as she was the victims of child sex trafficking at Defendants' nuisance hotel and suffered damages to her health, including mental and emotional harm, pain and suffering, and Defendant is liable to Plaintiff for all such damages.

## Public Nuisance Per Se

98.

The Hotel constituted a statutory nuisance per se under Georgia law because Defendant knowingly and/or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the Hotel including sex trafficking.

99.

A business where illegal practices are permitted constitutes a nuisance.

100.

A business, like the Hotel, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

101.

Plaintiff was directly harmed as a result of the sex crime nuisance at the Hotel that permitted illegal sexual activity to occur there.

102.

Defendants are liable for nuisance (public nuisance and/or per se public nuisance) by reason of his failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendants had express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

33

## DAMAGES

### 103.

Plaintiff incorporates the paragraphs above as if fully restated herein.

### 104.

As a proximate and foreseeable result of Defendants' violations of the TVPRA, Masha's Law, and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

    a. Personal injuries;

    b. Past, present and future conscious pain and suffering;

    c. Loss of enjoyment of life;

    d. Mental anguish and emotional distress;

    e. Incidental expenses;

f. All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

g. Consequential damages to be proven at trial.

105.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

106.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendants for the following:

a. Process issue as provided by law;

b.  Plaintiff be awarded actual damages in amounts to be shown at trial from Defendants;

c.  Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

d.  Plaintiff be awarded a trial by jury; and

e.  Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

This 17th day of July, 2026.

**ANDERSEN, TATE & CARR, P.C.**

/s/ *Tyler Dillard*

Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Tyler Dillard
Georgia Bar No. 115229
tdillard@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
Jennifer Webster
Georgia Bar No. 760381
Attorneys for Plaintiff

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
Phone: (770) 822-0900
Facsimile: (770) 822-9680

**CERTIFICATE OF COMPLIANCE**

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

**ANDERSEN, TATE & CARR, P.C.**

/s/ *Tyler Dillard*
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Tyler Dillard
Georgia Bar No. 115229
tdillard@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
Jennifer Webster
Georgia Bar No. 760381
Attorneys for Plaintiff

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
Phone: (770) 822-0900
Facsimile: (770) 822-9680